BENJAMIN BISSELL, HEZEKIAH BISSELL, ABEL BISSELL, ELIJAH HOUSE, FRANCIS NORTON, JOHN T. PETERS, and ASA WILLEY *against* DAVID POST.

WRIT of error.

This was an action of *trespass quare clausum fregit* against *Post*, brought originally before *Leonard E. Larupt law of the United States*, cannot be impeached before the common law urts.

The validity of a commission of bankruptcy, under the late bankruptcy, under the

June, 1809.  *throp*, Esq. a justice of the peace. The writ was dated

BISSELL   and served on the 28th of *June*, 1804.
v.
POST.        The defendant pleaded *title*, as lessee of *Daniel Wal-rous*, assignee of *John Wass*, a bankrupt under the laws of the *United States*. The plea was recorded, and the process and record certified up, according to the provisions of the statute.(*a*)

In the superior court, the plaintiffs replied, that before any act or pretended act of bankruptcy was committed, they, being *bonâ fide* creditors of *Wass*, attached the land described in the declaration, on the 23d of *January*, 1801, in a suit against him, which they prosecuted to final judgment, and having taken out execution, caused said land, on the 16th of *April*, 1804, to be appraised and set off in satisfaction thereof: and that, with intent to defraud the plaintiffs of their just demand against *Wass*, the commission, on the 7th of *July*, 1801, was sued out and prosecuted by collusion between *Wass* and the petitioning creditor, on a concerted act of bankruptcy, and without any just or legal debt on which to found the commission.

To this there was a demurrer.

The superior court adjudged the replication insufficient.

*J. T. Peters*, for the plaintiffs, contended,

1. That all fraudulent acts done to avoid the debt or duty of others, are void as against the party or parties, whose debt or duty is so endeavoured to be avoided, and this, both at common law, and by our statute. To this point he cited *Co. Litt.* 357. a. 3 *Co.* 77. 1 *Burr.* 396. *Cowp.* 434. 4 *Dal.* 335. *Stat. Conn.* tit. 76. s. 1.

2. That a party, whose debt or duty is endeavoured to be avoided, by a fraudulent commission of bankruptcy, may avail himself thereof, in a trial at law. After remarking, that there could be no doubt as to the *English*

(*a*) *Stat. Conn.* tit. 165. c. 1. s. 18.

law upon the subject, he cited and commented upon *B. Bissell et al.* v. *J. Wass*, decided by the six judges(*a*) of the superior court in *Tolland* county, *July* term, 1803. *A. Bissell* v. *B. Tyler et al. ibid.* · *Pleasants* v. *Meng*, 1 *Dal.* 380 *Joy's Lessee* v. *Cossart*, 2 *Dal.* 126. *Lovett* v. *Cutler*, 1 *Mass. Rep.* 67. *Winship's Assignee* v. *Winship*, before the supreme court of *Massachusetts*, 1804, MS. *M'Mechin's Lessee* v. *Grundy et al.* 1 *Hall's Amer. Law Journ.* 203. *Rugan et al.* v. *West*, 1 *Bin.* 263. *Barnes et al. Assignees* of *M·Laws, a Bankrupt*, v. *Billington et al.* before the circuit court of the *United States* in *Pennsylvania*.(*b*) And *Wood* v. *Owings*, 1 *Cranch*, 239.

June, 1809.

BISSELL
v.
POST.

(*a*) The superior court, at that time, consisted of six judges. ¡

(*b*) The following note of this case was read.

BARNES ET AL., Assignees of M'LAWS, *against* BILLINGTON, CORLESS & ISRAEL.

THIS was an action of trespass brought against the defendants, for taking and selling the goods of the bankrupt, after an act of bankruptcy, and *notice* to the defendants.

Upon the trial, the facts appeared to be as follows: *M'Laws* was a trader within the description of the bankrupt law. During the summer of 1800, his affairs became embarrassed; and being unable to meet his engagements, judgments were obtained against him, and one execution had issued, and was in the hands of the sheriff; *Billington* and *Corless*, two of the defendants, *his* particular friends, believing, upon an examination of his affairs, that his estate was fully solvent, early in *November*, 1800, discharged *all* these judgments, by which he was enabled to go on with his business as before. He was not, however, freed from embarrassments, but was still harassed by the creditors; so much so, that he soon after gave orders to his clerk to deny him to them; and during the month of *December* he concealed himself in a private room up stairs, and was frequently denied to his creditors. Some time in that month, *Hartung*, a clerk in the sheriff's office, and who occasionally served process, called at the house of *M'Laws*, who was denied to him; but it was not proved, that he actually had process, nor that any writ had then issued against *M'Laws.* At times, during this month, he had gone publicly into the streets, and during the remainder of the winter was as much abroad and at large

*Hosmer*, for the defendant, relied upon the case of *Barstow* v. *Adams*, 2 *Day*, 70. as having settled the law in this state, and forcibly urged the impropriety of departing from that decision.

as common. At the time of discharging the judgments, *Billington* and *Corless* had taken no security from *M'Laws*. But on the 13th of *January*, 1801, they told him they did not think themselves secure in case of his death, and requested from him a bond payable immediately, with a warrant of attorney to confess judgment. This they urged him to do particularly on account of his wife, who was in a strange country with a family of children, and they said they would endeavour to turn out every thing for the best. *M'Laws* told them this was giving them a decided preference, but as they had come forward to assist him in his distress, he had no doubt their motives were honourable. He accordingly gave them a bond and warrant, upon which they caused judgment to be immediately entered up; and on the next day, (14th of *January*,) a writ of *fi. fa* was taken out and delivered to the sheriff, who levied, or professed to levy it, on all the goods in *M'Laws'* store, and made return thereof in the following words: "Levied on goods as *per* inventory;" but no inventory accompanied the return, or was in fact ever made. The goods of *M'Laws*, by permission of *Billington* and *Corless*, remained in his possession, in his store in *Chesnut*-street, where he continued carrying on his trade, buying and selling as before the execution and levy. The petitioning creditor's debt arose for goods sold to *M'Laws* in the way of his business between *December* and *June*. In the beginning of *May*, *M'Laws* wished to remove to *Market*-street, which he mentioned to *Billington* and *Corless*, who said that they had no objections. He advertised his stock in *Chesnut*-street for sale, but did not sell it. On the 31st of *May*, *Billington* and *Corless* gave notice to *M'Laws*, that they had ordered the sheriff to sell his stock of goods to satisfy their execution. He was much surprised, and complained of this treatment; and offered to give them other security for their debt, if they would wait twenty days. They refused, and, by their orders, the sheriff, *Israel*, the other defendant, now took actual possession of the goods. *M'Laws* gave notice of these proceedings to his principal creditors, who immediately held a meeting upon the subject. On the next day, (*June* 1st,) a *capias* issued from the common pleas against *M'Laws*, at the suit of one *Goodwin*, returnable the same day. *M'Laws* concealed himself, and kept house, so that this process could not be served, and thereby committed an unequivocal act of bankruptcy; but it was contended upon the evidence, that this was a concerted plan between *Goodwin* and *M'Laws* for the express purpose of committing an act of bankruptcy, upon which to found a commission. On the 5th of *June*, a commission of bankruptcy issued against

BY THE COURT. The judgment of the superior court is affirmed, because it appears by the record, that the

*M'Laws.* On the 6th, the commissioners declared him a bankrupt, and issued their warrant of seizure to their messenger, who, finding the store locked, put a padlock on the door. Notice of these proceedings was given to the defendants, and they were warned not to meddle further with the bankrupt's goods. They, however, broke off the padlock; and on the 8th the sheriff actually sold the goods; whereupon this action was brought.

WASHINGTON, J. in charge to the jury, after stating the testimony very particularly   Upon this evidence, the first question is, did *M'Laws* commit an act of bankruptcy at any period within six months prior to the 5th of *June,* when the commission issued? If he did, then, secondly, what effect will it have upon *Billington* and *Corless's* execution of the 14th of *January?*

1. In examining the first question, we must proceed by steps. Did he commit an act of bankruptcy at any time before the 13th of *January,* 1801?

Evidence is given of his embarrassments, of his orders to be denied to creditors; and it appears that he actually was denied. Other witnesses say that he went out publicly, and carried on business as usual. But admitting that he did attempt to conceal himself from his creditors, and was denied to them, this will not constitute an act of bankruptcy under the bankrupt law of the *United States,* though it would under that of *England.* The first class of cases in our statute which constitute an act of bankruptcy, are, departing from the state, remaining absent therefrom, concealing himself within the state, or keeping his house, with an intent to delay or defraud his creditors, and so that he cannot be taken, or served with process. This restriction or limitation applies equally to the several members of the sentence, and is not confined to the last, as the plaintiff's counsel contended. Concealment from, or denial to, creditors, therefore, is not an act of bankruptcy, if it does not prevent the service of process.

But he was denied to *Hartung,* a sheriff's officer, in *December,* 1800. As to this, the law is, that if the debtor, with intent to delay or defraud his creditors, shall so conceal himself, or keep his house, that he cannot be served with process, it is an act of bankruptcy. This officer did call and was denied, but it does not appear on what day. It is immaterial whether the order of *M'Laws* to his clerk was to deny him to his creditors only, or to them and others; for if, in consequence of concealment from creditors only, a denial was made to an officer who was thereby prevented from serving process on him, it would be an act of bankruptcy.

June, 1809.

BISSELL

v.

POST.

plaintiffs were creditors of *Wass*, the bankrupt, at the time of issuing the commission against him; and, as such,

But there are two reasons why the denial of *Hartung* did not constitute an act of bankruptcy capable of supporting this commission.

1. Because it does not appear that he came to take *M'Laws*, or serve him with process. 2. If it did so appear, it should also be proved to your satisfaction that the circumstance took place on, or after the 5th of *December*, within six months previous to taking out the commission. As to the first point, the construction of the statute has been, that unless the officer goes to the house of the debtor for the purpose of serving process, it cannot be said, that he *so* keeps his house, *as that* he could not be served with process; for the law considers the attempt, and failure in it, as the proper evidence of the fact. Upon the same principle it is, that in *England*, where keeping house with an intent to defraud or hinder creditors of their debts, is an act of bankruptcy, the debtor must not only keep his house, but he must be actually denied to a *creditor*, and to a creditor coming to *demand payment of a debt*, the law considering that act as the proper evidence of the intent.(*a*)

The next period to be noticed is the 13th of *January*, 1801. The bond executed on that day, it is said, was giving a preference to *Billington* and *Corless*, on the eve of, and in contemplation of a bankruptcy. Though this were true, the preference will not constitute an act of bankruptcy, though it will be void as a fraud upon the general creditors; but though fraudulent and void, it is not enough for the plaintiffs, because it is incumbent on them to establish an act of bankruptcy to entitle them to recover. But the execution which issued upon the judgment, authorized by this bond and warrant, did, when executed, amount to an act of bankruptcy, if done by the procurement of *M'Laws;* as if at the time he gave the bond, it was agreed, that judgment be entered up, and execution taken out and levied immediately. But if the entering up the judgment, and issuing the execution, were acts of *Billington* and *Corless*, unsolicited by *M'Laws*, or not agreed upon when he gave the bond, it is not an act of bankruptcy. On the one hand, the unwillingness with which *M'Laws* gave the security seems to discountenance the idea of his having requested or produced what followed. On the other, considerations of benefit to his family thrown out by *Billington* and *Corless* might have influenced him to wish it. This, however, is a subject more proper for the decision of the jury, than of the court; and, therefore, it is left for them to say, upon the circumstances given in evidence, whether the taking of the goods of *M'Laws* in execution was, or was not, by his procurement. If the jury should be of opinion

(*a*) *Vide* 5 *Term Rep.* 575.    *Cooke's B. L.* c. 4.

might have opposed the proceedings in their commencement, or in any subsequent stage. If dissatisfied, their

that it was, their verdict must be for the plaintiffs; for it will then be an act of bankruptcy, and defeat the execution, however right it might be in other respects. But if the jury should be of opinion that the execution was not by his procurement, we must then proceed to the 1st of *June*.

On that day an act of bankruptcy was, *prima facie*, committed. A sheriff's officer was at the house of *M'Laws* with process at the suit of *Goodwin*, and was prevented from serving it by the house being locked up, and *M'Laws* within, refusing admittance. If this was a fair adversary transaction between *Goodwin* and *M'Laws*, then there is no doubt it was an act of bankruptcy. But if *it was a concerted* measure between *Goodwin* and *M'Laws*, or between *M'Laws* and any of his creditors, then it is not such an act as will give validity to the commmission against creditors *not concerned in the plot*. For the act must be done with *intent unlawfully to delay or defraud creditors*. But this measure, if *concerted*, so far from being intended to delay or defraud creditors, was clearly intended and calculated to benefit them, and to hasten the means of payment. This is a question for the jury upon the evidence. [Which the judge here recapitulated.] If they shall be of opinion, that the proceeding was adversary, then the plaintiffs will have established an act of bankruptcy on the 1st of *June*, and it will be necessary to inquire,

2. What legal effect it will have on the execution of *Billington* and *Corless* of the 14th of *January*.

The 31st section of the bankrupt law excepts from the general mass of creditors who are to come in *pari passu* under the commission, those who had obtained a lien by an execution *executed* upon the estate of the bankrupt previous to the act of bankruptcy. The question is, was this execution legally executed before the 1st of *June?*

The facts are, that after the execution was levied the goods remained in the possession of *M'Laws*, by the permission of *Billington* and *Corless*, and he continued to exercise every act of ownership over them until the 31st of *May*, or 1st of *June*. It was strongly contended, at the bar, by the defendants' counsel, that if the execution be once levied, a lien attaches, which will prevail against subsequent executions and subsequent purchasers, although the property seized has been redelivered to the debtor, has remained in his possession for any length of time, and so continued at the time of such subsequent execution or sale. I was surprised at this doctrine, and the more so, when the authority of the supreme court of *Pennsylvania* was quoted in support of it. I should certainly examine with great caution any question decided by the learned judges of that court, before I ventured to pronounce a different opinion. Although not bound by their decisions, they are,

only mode of relief is given in the 52d section of the "Act to establish a uniform system of bankruptcy."

and ought to be, highly respected. But if there be a question which has long since been settled and at rest, if there ever was a point settled upon correct and solid principles, it is the present, and in direct contradiction of the argument for the defendants. Nothing could be more mischievous than to permit a dormant execution to rise up at a distant period to defeat a subsequent sale fairly made on a subsequent execution. And in what does an execution in the sheriff's hands differ from one which has been levied, and the property redelivered to the debtor, making him thereby to acquire a false credit, and to defraud those with whom he may deal? Possession of personal property is the only *indicium* of ownership, and for this reason, if the vendor of such property remains in possession, it is fraudulent and void against creditors and purchasers. It cannot be said that an execution is really executed, when the debtor is permitted by the plaintiff to retain the possession; and exercise the same acts of ownership over it he did before. The effects of a seizure is to change the property in the goods, and to vest it in the sheriff. But no change in this case was produced, no lien created; both were prevented by the fraud which the law implies, where the property being changed, possession remains with the former owner, and with the consent of the person entitled. I am pleased to find, that this opinion corresponds with that of the supreme court of *Pennsylvania* in the case of *Chancellor* v. *Philips;(a)* although I do not yield my assent to the distinction there taken between household furniture and other goods. The decision in the late circuit court, in the case of *The United States* v. *Conyngham*, contains a full and able investigation of this doctrine, and is in perfect unison with the *English* decisions, and with my opinion.

But there is another objection to the title of *Billington* and *Corless* under the execution, which is equally fatal; and that is, the insufficiency of the levy. The sheriff must always designate the property seized under the execution, either in the body of the return, or by reference to a schedule accompanying it. The reason is obvious; the execution creating a lien, it should be known to others who may take posterior executions, or who may deal with the debtor, what property is affected by the lien, and what is not. In this case, the sheriff's return is, "levied on goods as *per* inventory;" but no inventory was made or returned with the execution. As *M'Laws* continued from *January* to *June* to sell and buy as usual, no person can say whether any, and which of the articles sold on the 8th of *June* were levied upon on the 14th of *January*.

(a) Since reported in 4 *Dallas*.

See the case of *Barstow* v. *Adams*, and the reasons there assigned on this point.(*a*)

### Judgment affirmed.

Upon the whole, if the jury are of opinion, upon the points submitted to them, that an act of bankruptcy was committed on the 13th or 14th of *January*, or on the 1st of *June*, they must find a verdict for the plaintiffs, notwithstanding *Billington* and *Corless's* execution. If otherwise, they must find for the defendants.

The jury found for the plaintiffs.

(*a*) As the arguments of counsel, and the opinion of the court, in *Barstow* v. *Adams*, are reported at considerable length, it is thought that a concise statement of this case, containing the grounds and authorities relied on, by the counsel, and the decision of the court, will be sufficient.